[899 NE2d 941, 870 NYS2d 835]

WHITE HOUSE MANOR, LTD., Respondent, v ROSE ELLEN BEN-
JAMIN et al., Respondents. KOREAN PRESBYTERIAN CHURCH,
Nonparty Appellant.

Argued September 10, 2008; decided November 20, 2008

**POINTS OF COUNSEL**

*Hughes Hubbard & Reed LLP,* New York City (*James C. Fitzpatrick, George A. Davidson, Nathan I. Nahm* and *Lewis D. Zirogiannis* of counsel), for appellant. I. A judgment against a nonparty on an unpleaded cause of action brought by an improper cross motion should be reversed as not in accordance with the law. (*Mango v Long Is. Jewish-Hillside Med. Ctr.,* 123 AD2d 843; *Matter of Jetter,* 78 NY 601; *Teitelbaum Holdings v Gold,* 48 NY2d 51; *Barzack Realty Co. v Legatti & Son,* 114 Misc 2d 245; *Johnson v Hunte,* 8 Misc 3d 133[A], 2005 NY Slip

Op 51160[U]). II. The judgment should be reversed because the irregular procedure violated due process. (*Murray v Hoboken Land & Improvement Co.,* 18 How [59 US] 272; *Carey v Piphus,* 435 US 247; *Mathews v Eldridge,* 424 US 319; *Fuentes v Shevin,* 407 US 67; *Skyline Agency v Coppotelli, Inc.,* 117 AD2d 135; *Mullane v Central Hanover Bank & Trust Co.,* 339 US 306; *Duckett v Ward,* 458 F Supp 624; *AmBase Corp. v Davis Polk & Wardwell,* 8 NY3d 428; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *Gray v Pashkow,* 79 NY2d 930.)

*Law Offices of Annette G. Hasapidis,* South Salem (*Annette G. Hasapidis* of counsel), for respondents. I. Korean Presbyterian Church failed to preserve its objection to the alleged lack of jurisdiction when it executed a settlement stipulation that did not limit the court's jurisdiction over the parties or the underlying contract. (*Merrill v Albany Med. Ctr. Hosp.,* 71 NY2d 990; *Sam & Mary Hous. Corp. v Jo/Sal Mkt. Corp.,* 62 NY2d 941; *Guaspari v Gorsky,* 29 NY2d 891.) II. The motion court had jurisdiction to rule that Korean Presbyterian Church breached the stipulation and the contract because the church was a party to the stipulation, which modified the underlying contract. The church waived any objection by accepting the benefits of the stipulation for years. The church's remaining due process claims are unique procedural circumstances of the church's own making which did not violate its due process rights. (*Sheehan v Marshall,* 9 AD3d 403; *Kleeberg v City of New York,* 305 AD2d 549; *Volpe v Canfield,* 237 AD2d 282; *Beal Sav. Bank v Sommer,* 8 NY3d 318; *Matter of Westmoreland Coal Co. v Entech, Inc.,* 100 NY2d 352; *Wynkoop Hallenbeck Crawford Co. v Western Union Tel. Co.,* 268 NY 108; *Hartford Acc. & Indem. Co. v Wesolowski,* 33 NY2d 169; *Beacon Term. Corp. v Chemprene, Inc.,* 75 AD2d 350, 51 NY2d 706; *Cortesi v R & D Constr. Corp.,* 73 NY2d 836; *Walker v Millard,* 29 NY 375.)

## OPINION OF THE COURT

READ, J.

In 1987, plaintiff White House Manor, Ltd. purchased 3.43 acres of undeveloped property in the Town of Greenburgh, Westchester County, from Travis Levy, and executed a mortgage on it. The mortgage was subsequently assigned to defendants Rose Ellen Benjamin, Joan C. Levy,[1] and Jerald Jay Levy (the Levys).

---

1. Both Rose Ellen Benjamin and Joan C. Levy died during the pendency of this proceeding. Georgia Sassen, as trustee under the trust agreement of

White House also purchased two neighboring parcels in 1987, and in 1990, obtained town approval to subdivide all three parcels into six lots, five of which were sold as building lots. White House intended to subdivide the remaining lot (8.03 acres), which contained the former Levy property and parts of the two other parcels, which were deemed merged as a matter of law. This lot received a new, single tax map designation, and is known as 1952 Saw Mill River Road, Elmsford, New York. When White House failed to fulfill certain requirements, however, the Town's final approval for subdivision of the 8.03-acre lot expired as a matter of law.

After defaulting on its mortgage payments to the Levys, White House deeded the Levys' former property back to them in June 1995 in lieu of foreclosure. Consequently, the Levys owned 3.43 acres of the larger 8.03-acre lot, while White House owned the remainder (4.6 acres). Since no separate tax assessment existed against the Levys' interest, White House continued to pay the real property taxes levied against the entire parcel.

The Town advised the Levys that the 8.03-acre lot needed to be subdivided in order for them to sell or build on their portion of it, and that subdivision approval would require sewer improvements, which the Levys discovered were costly. They therefore decided to market their property upon condition that the prospective purchaser would have to pay for severing the 3.43 acres, and obtaining any site plan approvals necessary for the purchaser's intended use.

In June 1999, White House commenced this unjust enrichment action against the Levys to recover their pro rata share of the real property taxes that White House had been paying on the 8.03-acre lot. In September 1999, the Levys answered and counterclaimed against White House, seeking contribution to subdivision costs.

Meanwhile, by a contract of sale dated August 6, 1999, Korean Presbyterian Church of Westchester purchased the 3.43 acres from the Levys for $380,000, making a $38,000 down payment into escrow. The sale was contingent upon the Church's securing any required government approvals—in particular, subdivision and site plan approvals from the Town and a road access permit from the New York State Department of Transportation—at its own expense. Further, paragraph "FOURTEENTH" of the August 1999 purchase contract provided that

Rose Ellen Benjamin, and Karen J. Levy, as the personal representative of Joan C. Levy's estate, have been substituted as parties defendant.

"[i]n the event the requisite approvals are not obtained . . . within six months from the date of receipt by [the Church] of a fully executed contract[, the Church] shall have the option of extending the approval period for an additional six (6) months after receipt by [the Church] of a fully executed contract and continuing each month thereafter until said approvals are obtained and the closing of title herein has occurred. In the event the [Church's] applications are denied or [the Church] determines from the approving boards['] memoranda and/or minutes that said approvals will not be granted, [the Church] shall forward documentation to [the Levys'] attorney confirming this denial, whereupon the down[ ] payment shall be promptly returned to [the Church], but not the . . . $2,000.00 monthly fee which shall be non[-]refundable. Said $2,000.00 fee is not a part of nor a credit against the Purchase Price herein. If said approvals are not obtained within one (1) year from the date of receipt by [the Church] of a fully executed contract, despite [the Church's] diligent efforts to obtain same, then either [the Levys] or [the Church] shall have the right to terminate this contract. In the event of such termination, the aforesaid down[ ] payment shall be promptly returned to [the Church], but not the $2,000.00 monthly fee, which, as previously stated, shall be non-refundable."

The Church, which got caught up in a three-year building moratorium, did not timely obtain the necessary approvals from the Town. Accordingly, by an agreement dated May 1, 2003, the Church and the Levys amended the August 1999 purchase contract, modifying paragraph "FOURTEENTH" to extend the option period until the earlier of January 31, 2004, or the closing of title on condition that the Church make "current the option payments due and owing . . . and continue to make the requisite [$2,000] option payments." Further, the parties modified paragraph "ELEVENTH" to make the Church's obligation to close title contingent upon obtaining subdivision approval only. Finally, the Church agreed to pay the Levys' "pro rata portion of real estate taxes for [the 8.03-acre parcel] commencing with the Town Tax due on April 30, 2003 and [to] be responsible for payment of such pro rata portions *from the date hereof to the date of closing*" (emphasis added).

Shortly after the Church and the Levys amended the purchase contract, White House, the Levys and the Church executed a "Stipulation of Settlement" to "settle" the unjust enrichment action. The stipulation, dated May 20, 2003 and "so ordered" by Supreme Court on June 4, 2003, stated that "on August 7 [*sic*], 1999, [the Levys] entered into a Contract of Sale to sell [their] portion of the subject premises to the [Church], which Contract has been amended by Agreement dated May 1st, 2003"; and further, "the [Church], as Contract Vendee, has a vital interest in the outcome of the instant litigation *and has agreed to be a party to the instant Stipulation*" (emphasis added). The stipulation did not incorporate into its provisions the terms of the August 1999 purchase contract or the May 2003 amendment of it.

The stipulation went on to provide that "it [was] hereby stipulated and agreed that the above captioned action is settled as follows," specifying that

> "[c]ommencing on or before April 30, 2003, the [Church] shall remit monies directly to [White House's former attorney] for [the Levys'] pro rata share of the real estate taxes for the year 2003 until the sooner of the closing of title pursuant to the aforementioned Contract[ ] of Sale, as amended and extended, the completion of the sub-division currently pending . . . , or *the termination of that Contract of Sale by the terms thereof due to the default of either [the Levys] or [the Church]*" (emphasis added).

The Levys further acknowledged that "they [would] . . . be responsible for their pro rata share of the real estate taxes in the event the closing of title envisioned above [did] not occur and the conditions of sale aforementioned [were] cancelled." For its part, White House waived any objection to the Church's pending subdivision application; and the Levys and the Church "waive[d] any objections they might otherwise have to any subdivision application . . . brought regarding the subject premises" by White House.

The Church subsequently requested, and apparently obtained, additional extensions of the purchase contract, claiming at one point that it had reached "the final stage" of town approval, and cautioning that "[i]f [the Levys] switch[ed] to a different buyer, they [would] start from scratch with the Town." In January 2005, however, the Church stopped making the $2,000

monthly option payments, and on March 28, 2005, the Levys complained to the Church. The Levys claim that, at about the same time, they discovered that the Church had not done anything to advance its subdivision or site plan applications for several months.

On March 31, 2005, the Church purportedly terminated the contract of sale pursuant to paragraph "FOURTEENTH" of the 1999 purchase contract, and demanded the return of its down payment. On April 4, 2005, the Levys rejected the Church's action. They took the position that the Church would be in "willful default" under the purchase contract, the amendment and the stipulation if it ceased to seek subdivision approval from the Town. The Levys apparently wrote the Church again on June 21, 2005, advising that they considered the Church to be in default.

Presumably because of the contract dispute between the Levys and the Church, neither of them paid the Levys' pro rata share of the real property taxes. This prompted White House to move by order to show cause, within its unjust enrichment action, to enforce the stipulation against the Levys and the Church. The Levys "cross-moved" within that action for a declaration that the Church was in default of the purchase contract, the amendment and the stipulation, and for concomitant relief.

In an order entered on February 7, 2006, Supreme Court granted the motion and the "cross motion." Judgment was entered (1) declaring the Church in default of the purchase contract, the amendment and the stipulation; (2) decreeing that the Church forfeited the down payment; (3) ordering the Church to turn over to the Levys all reports, studies, plans, maps and investigations completed in pursuit of the subdivision and site plan approvals; (4) ordering the Church to turn over to the Levys all engineering plans and confirm that all engineering and survey costs had been paid; (5) ordering the Church to pay the cost of a steep slope analysis necessary to complete the subdivision application; (6) ordering the Church to pay all municipal fees and costs required to complete the subdivision application; (7) ordering the Church to designate Jerald Jay Levy as authorized to complete the subdivision application; (8) ordering "[the Church to] pay to [White House] the share of [the Church] of 2005 *and any future county and town taxes*" (emphasis added); (9) ordering "[the Church to] pay to [White House] the share of [the Church] of 2005/2006 *and any future school taxes*" (emphasis added); and (10) awarding the Levys

$29,365 for missed option payments and interest thereon, $4,321.50 for the Church's share of the 2004/2005 county and town taxes and interest thereon, and $4,911.08 for the Church's share of the 2004/2005 school taxes and interest thereon. Supreme Court subsequently granted the Church's motion for reargument, but adhered to its decision.

The Church appealed, and in a decision dated July 10, 2007, the Appellate Division described the Church's appeal as follows:

> "In an action . . . to recover damages for unjust enrichment, nonparty [the Church] appeals, as limited by its brief, *from so much of [Supreme Court's March 2006 judgment], as, upon [Supreme Court's February 2006 order], inter alia, granting the cross motion [of the Levys], among other things, in effect, for summary judgment* declaring that [the Church] breached a contract for the sale of real property dated August 6, 1999, as amended May 4 [*sic*], 2003, and a stipulation of settlement dated June 4, 2003, is in favor of the [Levys], and against it declaring that [the Church] breached the contract for the sale of real property dated August 6, 1999, as amended May 1, 2003, and the stipulation of settlement dated June 4, 2003" (*White House Manor, Ltd. v Benjamin*, 42 AD3d 450, 450 [2d Dept 2007] [emphasis added]).

The Appellate Division "affirmed insofar as appealed from" (*id.*), concluding that

> "contrary to the [Church's] contention, . . . Supreme Court properly exercised its jurisdiction to enforce the terms of the subject stipulation of settlement to which the [Church] was a signatory. The [Church's] status as a nonparty contract vendee did not require the parties to seek enforcement of the settlement by plenary action" (*id.* at 451).

We subsequently granted the Church's motion for leave to appeal, and now reverse.

The mandates of CPLR 3212 were not satisfied in this case, and Supreme Court's order was thus not a proper award of summary judgment pursuant to article 32 of the CPLR. CPLR 3212 (a), titled "Time; kind of action," states that "Any party may move for summary judgment in any action, after issue has been joined." Here, however, it does not appear that any party

moved for summary judgment under CPLR 3212 and, more critically, issue was never joined by the Church. No matter how the Appellate Division described Supreme Court's judgment, there is simply no way that Supreme Court could have granted summary judgment against the Church.

But then Supreme Court never purported to do so; it simply granted various measures of relief without any citation to legal authority, statutory or otherwise. Given the presence of a "so-ordered" stipulation bringing the Church into this lawsuit in the first place, however, the only possible legal basis for Supreme Court's order was "[t]he power of a trial court to exercise supervisory control over all phases of pending actions and proceedings . . . [including] discretionary power to relieve parties from the consequences of a stipulation effected during litigation" (*Teitelbaum Holdings v Gold*, 48 NY2d 51, 54 [1979] [citation omitted]). Because the inherent authority described in *Teitelbaum* extends only to the enforcement of a stipulation within a pending action or proceeding, it is necessary to map out the boundaries of the stipulation in this case.

As an initial matter, the original unjust enrichment action brought by White House against the Levys concerned only the pro rata division of real property taxes between those parties. Critically, however, the Church expressly agreed to make itself a party to the stipulation settling this property tax dispute. The Church not only signed the stipulation, but also appeared at Supreme Court proceedings regarding the stipulation and agreed, pursuant to the stipulation itself, that the Church "ha[d] a vital interest in the outcome of the instant litigation and ha[d] agreed to be a party to the instant Stipulation." Insofar as the "cross-motion" in this case was actually brought merely to enforce the stipulation, the Church should be considered a party pursuant to *Teitelbaum*. Similarly, since the Church was given notice and an opportunity to appear (and, indeed, availed itself of that opportunity) in proceedings regarding the stipulation, any relief directed merely toward enforcement of the stipulation does not offend the Church's due process rights.

In sum, to the extent that Supreme Court's order enforced the terms of the stipulation against the Church, this was proper under *Teitelbaum*. In the stipulation, the Church agreed to pay the Levys' pro rata share of real property taxes to plaintiff's former attorney until the soonest of (1) the closing of the purchase contract, (2) subdivision of the 8.03-acre tax parcel, or (3) termination of the purchase contract due to the default of ei-

ther the Levys or the Church. The appealed-from judgment says that "[the Church] is *in default* pursuant to the terms of the Contract of Sale dated August 6, 1999, the Amendment thereto dated May 1, 2003 and the [stipulation] dated . . . June 4, 2003" (emphasis added), without specifying when or how any default may have occurred.[2] To the extent that the judgment directs the Church to pay the Levys' pro rata share of property taxes after termination of the contract under this provision of the stipulation, it is erroneous. Insofar as differences remain between the Levys and the Church over the Church's obligation to pay real estate taxes, those differences should be resolved by Supreme Court on remittal. But since Supreme Court only had the power under *Teitelbaum* to enforce the stipulation, so much of its judgment as ordered remedies against the Church for its purported breach of the purchase contract and its amendment is inappropriate. If the Levys desire to pursue a claim against the Church for breach of contract, they will have to commence a plenary action by filing a summons and complaint (*see* CPLR 304), after which the Church would have at least 20 days to answer (*see* CPLR 320). Then, after issue is joined, the Levys may move for summary judgment if they believe there are no material disputed issues of fact to be resolved (*see* CPLR 3212). The stipulation in the unjust enrichment action does not afford the Levys a way to bypass these procedural steps, or a portmanteau for all their claims against the Church.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order reversed, etc.

---

2. Both parties originally interpreted the judgment to make the Church liable for property taxes prospectively, either without end (according to the Church), or until the Levys completed the subdivision process (according to the Levys). The Levys now contend that the Church defaulted in March 2005 and is liable for property taxes through March 31, 2005; the Church disputes that it defaulted at all, and takes the position that its obligation to pay the Levys' pro rata share of the property taxes ended in January 2005 when it terminated the 1999 purchase contract under paragraph "FOURTEENTH" by ceasing to make option payments.